MARION BODAM, Indiv. and as Special Adm'r of the Estate of Scott Bodam, Deceased, Plaintiff-Appellant, v. THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—91—2964

Opinion filed January 15, 1993.

Craig D. Tobin & Associates, of Chicago (Craig D. Tobin and Thomas Petkus, of counsel), for appellant.

Hennessy & Cihak, P.C., of Chicago (Barry Locke and Michael J. Hennessy, of counsel), for appellee Estate of Gilbert Armbruster.

JUSTICE MURRAY delivered the opinion of the court:

Plaintiff, Marion Bodam (Bodam), individually and as special administrator of the estate of her husband, Scott Bodam (Scott), deceased, appeals from a directed verdict granted to Judith Belva, administrator of the estate of Gilbert Armbruster. For the reasons that follow, we affirm the ruling of the trial court.

On September 5, 1984, Scott Bodam, a freelance painter, fell to his death while working on a building located at 1652 West Belmont in Chicago. The building was owned by the estate of Gilbert Armbruster. On April 16, 1985, Marion Bodam instituted a wrongful death lawsuit in her capacity as administrator of the estate of her deceased husband. She named as defendants the City of Chicago (City) and Judith Belva (Belva), as special administrator of the estate of Armbruster (the Estate).[1]

The initial complaint charged the City with negligence, contending that it had improperly maintained certain overhead wires near the building at 1652 West Belmont and that these wires proximately caused Scott to be electrocuted and then fall to his death. In a second count Bodam charged the Estate with wrongful death under the Illinois Structural Work Act (commonly referred to as the Scaffolding Act). See Ill. Rev. Stat. 1985, ch. 48, par. 60 *et seq.*

---

[1] The complaint was initially filed against Mildred Armbruster, as administrator of the estate of her husband, Gilbert Armbruster, deceased. However, on August 25, 1989, during the course of this litigation, Mildred Armbruster died. On February 8, 1991, Judith Belva, the daughter of Gilbert and Mildred Armbruster, was named special administrator of the estate for the purpose of defending the cause of action.

The complaint was later amended. The amended complaint restated the negligence count against the City. However, it also charged the Estate with negligence, contending that an electrical sign which was attached to the building was improperly maintained and that the sign was the proximate cause of Scott's electrocution and fall. In addition, Bodam charged both the City and the Estate with negligence on a theory of *res ipsa loquitur* and the Estate, once again, with a violation of the Scaffolding Act.

On May 21, 1991, trial began. Evidence adduced at trial indicated that the building at 1652 West Belmont required some rehabilitation and maintenance, so that the Estate hired Wally Kostachewsky (Kostachewsky), a freelance painter and friend of Judith Belva and her husband Brian,[2] to complete the necessary work on the building. After working on the building for two weeks, Kostachewsky was contacted by a friend, Scott Bodam, who asked if Kostachewsky had any work for him to do. Scott was also a freelance painter who had worked with Kostachewsky on other occasions. They sometimes called each other when they needed someone to assist on a job.

Kostachewsky said that he could use some help painting the peak of the building on Belmont and said he would ask Belva if it would be alright to let Scott assist. Belva agreed and Kostachewsky called Scott on September 4, 1984, to work on September 5, 1984.

At about 8:20 a.m. on September 5, 1984, Scott arrived at the 1652 West Belmont location and assisted Kostachewsky in setting up the equipment necessary for the job. To reach the peak of the building required a long extension ladder, which neither Kostachewsky nor Scott owned. However, Brian Belva gave them permission to use a metal extension ladder that was stored at the building. That morning Scott and Kostachewsky positioned the ladder and Scott began to paint.

Scott worked on the ladder, climbed down, repositioned the ladder and then climbed back up. At about 10 a.m., Scott climbed down the ladder again and left the area for about one hour. Upon his return, he and Kostachewsky had some lunch. After lunch, however, when Scott scaled the ladder to retrieve his paint bucket and resume work, he fell to his death.

Kostachewsky, who was on a nearby scaffolding, saw Scott begin to climb the ladder. He looked away as he reached for a scraper to

---

[2]In fact, Kostachewsky resided in the same building as the Belvas, at 2300 Lawndale, and the Belvas were his landlords and neighbors.

give to Scott. Then Kostachewsky heard an "Uuhh" sound. He looked up just in time to see Scott throw his arms back and fall from the ladder.

Dr. Edmund Donoghue, deputy chief medical examiner for Cook County, supervised and assisted in the autopsy examination of Scott Bodam. He testified that the autopsy revealed that although Scott's death was due to injuries he sustained because of the fall from the ladder, Scott fell from the ladder because of electrocution. Because the autopsy indicated electrocution, Dr. Donoghue, along with two other medical examiners, went to the Belmont Avenue address on September 6, 1984, to inspect the scene of the accident. There they spoke with Kostachewsky. During this investigation it was determined that the electrical sign attached to the building was disconnected from any power source.

William Switalski, a mechanical and forensic engineer, testified that he had inspected the building and the location where Scott had been when he had fallen. Based upon his observations and calculations he believed that there were only two possible sources of electricity that could have caused Scott's electrocution. One was the sign which was attached to the building, the other was the overhead alarm wires, which were owned by the City. Mr. Switalski also testified that the overhead wires were the more likely source of the electricity and that areas on the overhead wire were bare where the insulation was frayed and had been worn away.

After plaintiff's evidence was presented, the Estate moved for a directed verdict, arguing that all the evidence pointed to the fact that the source of the electricity that caused Scott's electrocution and fall was the City's wires and that there was no liability under the Scaffolding Act. The trial court granted the Estate's motion for directed verdict as to all counts raised against it and the trial proceeded only as to the City.

The jury returned a verdict in favor of the plaintiff and against the City in the amount of $685,500, with a 70% reduction due to Scott's contributory negligence. Neither the City nor plaintiff has appealed from that judgment, nor is the City a part of the present appeal. The present appeal is brought by plaintiff only from the trial court's order granting the Estate a directed verdict. Nevertheless, plaintiff's plea for relief seeks reversal of the judgment below and a remand for a new trial.

Initially, we note that both parties have presented forceful briefs concerning the propriety of the trial court's directed verdict in the Estate's favor. However, neither party has addressed the impact that

the judgment entered against the City of Chicago has upon this appeal. We find, however, that the judgment entered against the City does affect the issues here. In fact, the issue of the Estate's liability, at least with respect to the negligence counts, is moot based upon the fact that a judgment, which has not been appealed and is now final, has been entered against the City. Thus, we find that there is no need to determine the correctness of the trial court's directed verdict in favor of the Estate on the two negligence counts.

In order to recover in a negligence action, a plaintiff must be able to show: (1) the existence of a duty, (2) a breach of that duty, (3) an injury proximately resulting from the breach, and (4) damages. (*Lucker v. Arlington Park Race Track Corp.* (1986), 142 Ill. App. 3d 872, 492 N.E.2d 536.) Damages cannot be severed from the liability issue during a plaintiff's case because damages are an integral part of a *prima facie* case of negligence. (*American National Bank & Trust Co. v. City of North Chicago* (1987), 155 Ill. App. 3d 970, 508 N.E.2d 1111.) In the present appeal Bodam seeks a reversal of the directed verdict entered against her and a new trial to prove that the Estate was negligently liable for the wrongful death of Scott. However, even if Bodam were given the opportunity to prove liability in a new trial, Bodam would be unable to make out a *prima facie* case. This is because any compensatory damages to which Bodam would be entitled have already been satisfied by the final judgment entered against the City of Chicago.

■■ ■ At oral argument plaintiff's attorney all but conceded that the negligence counts were no longer viable. Counsel's only argument for allowing the negligence counts to be litigated was an unsupported claim that plaintiff should not be limited to the amount of damages determined in the trial against the City. However, it has long been held that where a plaintiff has been awarded damages in a lawsuit against one tortfeasor and then seeks to hold a second tortfeasor liable for the same injury in a subsequent action, the plaintiff is estopped by the former adjudication from recovering an amount of damages greater than that awarded in the first suit. (See *Riley v. Unknown Owners of 304 North Oak Park Avenue Building* (1975), 25 Ill. App. 3d 895, 324 N.E.2d 78.) Consequently, since plaintiff would be unable to obtain any greater damages in a subsequent lawsuit against the Estate and she has already been fully compensated by the City, plaintiff has no cause of action against the Estate based upon a theory of negligence since she is lacking an essential element, *i.e.*, damages.

Despite the preclusive effect that the doctrine of collateral estoppel has upon the negligence counts, plaintiff argues she is not estopped from pursuing the alleged violation of the Illinois Structural Work Act and that this court should reverse the trial court's order granting the Estate a directed verdict on this issue. It is plaintiff's position that, even if recovery of damages were limited to the total amount of damages as determined by the trial court in the first suit against the City, she could still recover the amount of damages that were deducted from the total judgment based upon Scott's contributory negligence. This is because the common law doctrines of assumed risk and contributory negligence may not be considered when determining damages upon a showing of a violation of the Illinois Structural Work Act. *Schmid v. United States* (7th Cir. 1959), 273 F.2d 172; *Bryntesen v. Carroll Construction Co.* (1963), 27 Ill. 2d 566, 190 N.E.2d 315.

Although we find the inconsistency and inequity of this situation to be puzzling, it has apparently been held that it is not unconstitutional for the Act to allow construction workers' widows suing under the Scaffolding Act to recover more than widows of other persons suing under some other theory or law. (*Mitseff v. Acme Steel Co.* (N.D. Ill. 1962), 208 F. Supp. 805.) Thus, this court must consider whether the trial court erred in granting the Estate's motion for directed verdict on this count.

On appeal plaintiff argues that the trial court erroneously granted the Estate a directed verdict based upon a finding that the Estate was not in control of the jobsite within the meaning of the Structural Work Act. However, this representation is not entirely accurate. While it is true that the trial court stated at some point during argument on the motion "[t]here's not one scintilla of evidence that he (Brian Belva) ever used any control over him (Scott) that day," this does not seem to be the only basis for the trial court's ruling on the motion for directed verdict. In an earlier discussion of the evidence during argument on the motion, the trial court also considered the fact that there was no evidence that the ladder had any burn marks on it which might indicate that it had come in contact with the electricity, there was no evidence that the ladder was defective, and there was no evidence that the ladder was unstable causing it to move or slip so as to cause Scott to come in contact with the electrical wires.

We believe that, under the circumstances, the Illinois Supreme Court's recent ruling in *American National Bank & Trust Co. v. National Advertising Co.* (1992), 149 Ill. 2d 14, 594 N.E.2d 313, is directly applicable. In *American National* the plaintiff's deceased (Lu-

kas) was electrocuted while painting a billboard sign. Lukas and his co-worker set up an aluminum staging supported by grappling hooks attached to the top of the sign. After painting the middle of the sign, Lukas climbed a ladder up to the top of the sign to move the grappling hooks. Although there were no witnesses, the coroner established that Lukas' forehead somehow came in contact with a nearby high voltage line.

After reviewing a number of cases which have interpreted the Scaffolding Act in the context of workers' contact with electrical or power lines, the court held that the purpose of the Structural Work Act was to ensure stable support to a worker and, thus, it had no application to a situation where a stable support structure's placement near electrical wires allowed the worker to come in close proximity to ambient hazards such as electrical wires.

Although we believe that the *American National* case is dispositive of the matter here, another case, *O'Rourke v. Oehler* (1989), 187 Ill. App. 3d 572, 543 N.E.2d 546, lends further support for our judgment. In *O'Rourke* the trial court granted summary judgment to defendant on the issue of a violation of the Structural Work Act finding that the Act was not intended to cover any and all construction site injuries, but rather, that it must be shown that the structure or supporting device was defective and that the defect proximately caused the injury.

■ In the present case, as in *O'Rourke* and *American National*, there was no evidence that the supporting device was defective or unstable. The ladder was in good condition and contained rubber "shoes" to keep it from slipping. It is true that, being metal, it was a conductor of electricity. However, that fact alone does not make the ladder defective, especially since there was no evidence that the ladder came directly in contact with electricity.

Furthermore, even if the trial court did grant the directed verdict based upon a finding that the Estate failed to exercise the necessary control over the jobsite, we would have to affirm the decision. We agree with the court in *O'Rourke* when it stated that "[m]ere ownership of a premises on which structural work was being performed or retention of the right to reject or stop the work is not a sufficient basis for holding an individual is 'in charge' of structural work within the meaning of the Structural Work Act." (*O'Rourke*, 187 Ill. App. 3d at 583.) In the present case there was no evidence that the Estate or its representatives were in charge of or exercised any control over the jobsite. Scott and Kostachewsky, both professional freelance painters, set the ladder up and worked without direction or supervision.

For the reasons stated above, we affirm the order of the circuit court granting the estate of Armbruster directed verdicts on the three counts lodged against it by the estate of Bodam.

Affirmed.

GORDON, P.J., and COUSINS, J., concur.