NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

ASPEN BIOTECH CORPORATION, et al., *Plaintiffs/Appellees,*

*v.*

JASON K. WAKEFIELD, *Defendant/Appellant.*

---

JASON K. WAKEFIELD, *Counterclaimant/Appellant,*

*v.*

JON NIKOLAI CARLSON, *Counterdefendant/Appellee.*

---

VIKING RESOURCES, LLC, *Cross-Claimant/Appellee,*

*v.*

JASON K. WAKEFIELD, *Cross-Defendant/Appellant.*

---

No. 1 CA-CV 20-0384
FILED 8-10-2021

---

Appeal from the Superior Court in Maricopa County
No. CV2015-013984
The Honorable Christopher Whitten, Judge

**AFFIRMED**

COUNSEL

Sparks Law Group, PLLC, Scottsdale
By James D. Sparks (argued)
*Counsel for Plaintiffs/Appellees*

Law Office of Craig Stephan, Scottsdale
By Craig Stephan (argued)
*Counsel for Defendant/Counterclaimant/Cross-Defendant/Appellant*

Manning & Kass, Ellrod, Ramirez, Trester LLP, Phoenix
By Anthony S. Vitagliano (argued) & Robert B. Zelms
*Counsel for Counterdefendants/Appellees Edward and Kysa Britt*

Stoops Denious Wilson & Murray, PLC, Phoenix
By Michael T. Denious (argued)
*Counsel for Cross-Claimants/Counterdefendant/Appellees Jon Nikolai Carlson
and Viking Resources, LLC*

**MEMORANDUM DECISION**

Presiding Judge Paul J. McMurdie delivered the Court's decision, in which Judge Cynthia J. Bailey and Judge Lawrence F. Winthrop[1] joined.

**M c M U R D I E**, Judge:

¶1 Jason Wakefield appeals from several judgments and post-trial motions entered by the superior court following a jury trial. For

---

[1] Judge Lawrence F. Winthrop was a sitting member of the court when the matter was assigned to this panel. He retired effective June 30, 2021. In accordance with the authority granted by Article 6, Section 3, of the Arizona Constitution and A.R.S. § 12-145, the Chief Justice of the Arizona Supreme Court designated Judge Winthrop as a judge *pro tempore* in the Court of Appeals, Division One, for the purpose of participating in the resolution of cases assigned to the panel during his term in office.

the following reasons, we affirm the judgments and the superior court's orders.[2]

**FACTS[3] AND PROCEDURAL BACKGROUND**

**¶2**　　　　At its core, this case centers on three men, Jason Wakefield, Edward Britt, and Jon Nikolai Carlson, and the corporate reorganization of two companies, Aspen Biotech Corporation ("Aspen"), a Delaware corporation, and Applied Biologics, LLC ("Applied"), a New Mexico limited liability company (collectively, the "Company").[4] Wakefield, Britt, and Carlson met in 2005 and became friends. At the time, Wakefield worked in the medical-sales industry selling spinal implants. In 2008, Britt, a licensed Arizona attorney providing occasional legal advice and representation to Wakefield, assisted him in founding a distributorship, Ethos Medical. In time, Carlson joined Wakefield at Ethos Medical.

**¶3**　　　　In 2010, Wakefield and Carlson became interested in selling medical products containing amniotic fluid and made a deal with a supplier. To facilitate this new business, Wakefield organized Applied. Although Wakefield was officially the sole member-manager of Applied, he and Carlson had an oral agreement for Carlson to acquire a fifty-percent stake in Applied for $50 at his discretion.

**¶4**　　　　Over the next three years, Wakefield and Carlson succeeded in growing Applied's business. During this period, Britt aided Applied by providing legal services and entered an advisory board agreement with Applied, where he was paid a retainer through his business, Martin Castleberry Co., Inc. ("Martin Castleberry"). In late 2013, Britt entered a second agreement with Applied for legal services. The contract contemplated a retainer of $12,000 for a minimum period of six months, beginning November 2013 and ending April 2014.

---

[2]　　On the court's motion, it is ordered amending the caption as reflected above to correct a misspelling of Wakefield's name and directing that the above captions be used in all further documents filed in this appeal.

[3]　　We view the evidence in the light most favorable to sustaining the verdicts. *Walter v. F.J. Simmons & Others*, 169 Ariz. 229, 231 (App. 1991).

[4]　　We refer to the Company, Carlson, Britt, and their related entities collectively as the "Appellees."

¶5          At the same time, Wakefield, Britt, and Carlson began to discuss reorganizing Applied. They planned to form a new corporation and transfer ownership of Applied to it. They decided that Britt would become the CEO of this new corporation. Before the reorganization took place, Wakefield and Carlson drafted their agreement as a written contract, and Carlson exercised his option to purchase a fifty-percent membership stake in Applied.

¶6          On January 8, 2014, Britt filed articles of incorporation for Aspen in Delaware. Two days later, Wakefield, Britt, and Carlson each entered an agreement to reorganize Applied and other related companies as wholly owned subsidiaries of Aspen BioTech, Inc., entitled the "Reorganization & Buyback Agreement" (the "Reorganization Agreement"). In this agreement, Wakefield, Britt, and Carlson agreed that Applied would become a wholly owned subsidiary of Aspen, and each would own equal shares of Aspen. The Reorganization Agreement itself noted, however, that it was entered between Aspen BioTech, Inc., Applied Biologics incorporated in New Mexico, Applied Biologics incorporated in South Dakota, Metropole Biogenics, Wakefield, Martin Castleberry, and Viking Resources, LLC ("Viking"), an entity associated with Carlson.

¶7          On January 21, 2014, Aspen received its incorporation certificate from Delaware. The next day, Aspen and Wakefield entered two interrelated agreements entitled the "Exchange Agreement" and the "Assignment of Membership Interest" (collectively, the "Exchange Agreement"). In the Exchange Agreement, Wakefield and Aspen agreed to exchange "all interest" Wakefield owned in Applied for 1 million shares of stock in Aspen. The agreement was signed by Wakefield and Britt, with Britt signing on behalf of Aspen as the president and director.

¶8          Following the reorganization of Aspen and Applied and Britt's ascent within the Company, however, the relationship between Wakefield, Britt, and Carlson deteriorated. Wakefield, who was displeased about the reorganization, threatened to dismantle the Company by cutting off its suppliers, distributors, and customers. Wakefield also separately solicited Britt and Carlson to join him while ousting the other. In the summer of 2014, Wakefield retained outside counsel to negotiate a buyout of his interest in the Company. Eventually, Britt and Carlson terminated Wakefield from the Company in October 2014.

¶9          After his termination, Wakefield's threats regarding the Company proved prophetic. In December and January 2015, Wakefield met with Shannon McPherson, from Applied's largest distributor, Mac Medical,

and other medical-sales industry members involved with the Company. During this time, Mac Medical was under contract with Applied and was subject to non-compete provisions preventing it from selling competing products. By a second meeting in January 2015, Wakefield worked as a consultant for Spectrum Medical ("Spectrum").

¶10         In February 2015, Mac Medical stopped placing orders with Applied for a particular product. Instead, it began to buy the product from a competing business, ReGen Biosolutions, Inc. ("ReGen"), violating its still-active contract with Applied. ReGen and Spectrum shared the same management, and Wakefield received between $10,000 and $20,000 per month working as a consultant for Spectrum.

¶11         The ongoing buyout negotiations for Wakefield's Applied stock broke down. In October 2015, the Company issued a resolution stating that Britt and Carlson's original intent in forming the Company was to give 1 million shares of stock to them. The resolution did not mention Wakefield's interest in the Company.

¶12         The Company eventually filed suit against Wakefield and several other parties, alleging, *inter alia*, that Wakefield: (1) breached the terms of the Exchange Agreement; (2) breached the implied covenant of good faith and fair dealing for the same contracts; (3) breached his fiduciary duties as an employee of Applied; and (4) tortiously interfered with Applied's existing relationships and contracts with vendors, distributors, and customers. The Company also sought a declaratory judgment that Wakefield was not entitled to any shares of Aspen stock because he breached the Exchange Agreement.

¶13         In response, Wakefield joined Carlson and Viking as parties to the suit and filed an eleven-count counterclaim against the Appellees, all arising from the reorganization of Aspen and Applied. He asserted the following claims relevant to this appeal: (1) breach of contract for violating the Reorganization Agreement by failing to issue him 1 million shares of Aspen stock and allocate distributions to him; (2) breach of the implied covenant of good faith and fair dealing, again arising from the Reorganization Agreement; (3) breach of the fiduciary duties owed by Britt to Wakefield as his attorney related to the reorganization; (4) constructive fraud, for essentially the same claim; (5) common-law promissory fraud against Britt and Carlson for promising to perform their obligations under the Reorganization Agreement without intent to do so; and (6) fraudulent concealment against Britt for concealing the fraudulent nature of the reorganization of Aspen and Applied. Viking subsequently filed a

cross-claim against Wakefield, seeking recovery for an agreement to settle a $20,000 debt between Carlson and Wakefield.

¶14　　　　After nearly four years of litigation too labyrinthian to summarize here, the court held a ten-day trial in October 2019. Before the trial, Wakefield elected to pursue only his tort claims, and the parties ultimately presented a total of eight claims, including counterclaims and crossclaims. The jury returned the following verdicts: (1) in favor of the Company and against Wakefield for $124,156 on its interference claim; (2) in favor of Wakefield and against Britt for $562,000 on his breach-of-fiduciary and constructive fraud claims; and (3) in favor of Viking and against Wakefield for $20,000 on its breach-of-contract crossclaim. The jury found no liability for the remaining claims. After receiving briefing on the Company's outstanding declaratory-judgment claim and the parties' respective applications for attorney's fees and costs under A.R.S. §§ 12-341 and -341.01, the court issued a detailed order finding the declaratory judgment action moot and awarding attorney's fees to Appellees.

¶15　　　　In May 2020, the court entered separate final judgments for Carlson and Viking. After several amendments, the court issued a final judgment in June 2020, offsetting Wakefield's recovery on his claims against the Company and Britt's attorney's fees and costs awards, resulting in a final award in favor of the Company for $123,935. Wakefield appealed from each judgment and several orders denying motions for judgment as a matter of law and a new trial. We have jurisdiction under A.R.S. § 12-2101(A)(1) and -2101(A)(5).

## DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion by Precluding Wakefield's Expert from Testifying About Wakefield's Economic Damages.

¶16　　　　Wakefield retained John White, a CPA with certifications and accreditations in business valuations and appraisals, to render an expert opinion on Wakefield's economic-damages claim during the pre-trial proceedings. White issued a report opining that Wakefield's damages, which represented a one-third equity interest in Aspen, exceeded $15 million. Appellees moved *in limine* to preclude White's opinion under Arizona Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Appellees argued that despite White's characterization of his report as for "economic damages only" and "not a valuation or

appraisal of an equity ownership interest in any entity," he arrived at his calculation of economic damages by valuing Aspen at over $45 million.

¶17        In August 2019, after an evidentiary hearing where White testified concerning his analysis and methodology, the court granted the Appellees' motion. It precluded White from opining on the value of Aspen to support Wakefield's economic-damages claims. In its ruling, the court found that White's opinion was a "thinly veiled valuation opinion under the cloak of a damages calculation" because by assessing Wakefield's damages-claim for the value of a one-third equity interest in Aspen, White necessarily opined on Aspen's value. The court concluded that White's opinion concerning Aspen's value was unreliable because White conceded that he had "not applied any method of accepted business valuation" in valuing Aspen.

¶18        Wakefield contends the court's preclusion ruling was erroneous, arguing White's calculation of Aspen's value was reliable and that any dispute concerning White's methodology goes to the weight of his opinion, not its admissibility under Rule 702 and *Daubert*. We review the superior court's decision to admit or preclude expert testimony for an abuse of discretion. *State ex rel. Montgomery v. Miller*, 234 Ariz. 289, 297, ¶ 15 (App. 2014). "[Rule 702] provides that a trial judge serves as a 'gatekeeper' who makes a preliminary assessment as to whether the proposed expert testimony is relevant and reliable." *Id.* at 298, ¶ 19. "[T]he party seeking to admit expert testimony must prove, by a preponderance of the evidence, that the testimony is both[.]" *Id.* Because Rule 702 is identical to Federal Rule of Evidence 702, "the federal rule's background and its application by federal courts shed light on the meaning of Arizona's Rule[.]" *State v. Salazar-Mercado*, 234 Ariz. 590, 592, ¶ 7 (2014).

¶19        The superior court's ruling turned upon the application of Rule 702(c), which requires an expert's testimony to be based on "reliable principles and methods." "Under this requirement, an expert must be able to explain how his methods, reasoning and opinions are based on 'an accepted body of learning or experience.'" *Miller*, 234 Ariz. at 298, ¶ 23 (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendments.). *Daubert* provides five non-exclusive factors for courts to consider when evaluating the reliability of expert testimony:

> (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique or theory is generally accepted within the relevant

scientific community; (4) the known or potential rate of error of the technique or theory when applied; and (5) the existence and maintenance of standards controlling application of the technique.

*Miller*, 234 Ariz. at 299, ¶ 24 (citing *Daubert*, 509 U.S at 593–94). None of these factors are dispositive on the question of the expert's reliability, and not all *Daubert* aspects apply to "all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999).

**¶20** Deviation from a standard methodology typically goes to the weight of the expert's opinion rather than its admissibility. *See Maricopa County v. Barkley*, 168 Ariz. 234, 239 (App. 1990). "[C]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible [expert] evidence." *Miller*, 234 Ariz. at 298, ¶ 20 (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3rd Cir. 1999)). But *Daubert* requires that the expert's conclusions "[be] supported by good grounds for each step in the analysis." Thus, "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994) (emphasis omitted); *see also Amorgianos v. Nat. R.R. Passenger Corp.*, 303 F.3d 256, 266 (2nd Cir. 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and [Federal] Rule 702 mandate the exclusion of that unreliable opinion testimony."). Nor is the court required to admit expert opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Amorgianos*, 303 F.3d at 266 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**¶21** Applying these principles here, we conclude that the superior court correctly exercised its role as a gatekeeper by prohibiting White from testifying about Wakefield's economic damages. Because Wakefield claimed he was entitled to the value of a one-third equity interest in Aspen as economic damages, White's opinion was necessarily predicated on determining the value of Aspen. White did so by multiplying the per-share value of Aspen outlined in a single stock transaction ($7) by the total number of outstanding shares at the time of the transaction (6.5 million), arriving at a market value for Aspen of over $45 million. He further opined that this figure was reasonable by summarizing the Company's balance and income statements from 2012 to 2016. At the same time, however, White specifically (1) denied that it was "valuation or appraisal of an equity ownership interest in any entity"; (2) disclaimed any interpretation of its

analysis as "an opinion of value for any interest" or an "appraisal of the market value of any equity interest in Aspen"; and (3) cited no relevant authority to support his single-stock-transaction approach for calculating Aspen's value.

**¶22** White then exacerbated the disconnect between his analysis and disclaimers during the *Daubert* hearing, where he vacillated between (1) admitting that he had conducted a form of valuation by relying on the figures provided in the stock transaction and (2) insisting that he had not performed a valuation of Aspen. White also explicitly conceded that he had not utilized any of the three accepted approaches (income, asset, and market) for valuing a business or followed the "voluminous" steps he would consider necessary to perform a valuation or appraisal. *See Amorgianos*, 303 at 266 (exclusion warranted when expert data and methodology are "simply inadequate" to support the expert's conclusions). Although White eventually claimed that a valuation was unnecessary because a stock-transaction among insiders was "a strong indicator of value," Wakefield was unable to buoy White's assertion with reputable outside authority because he had not previously disclosed materials related to the matter. *See Joiner*, 522 U.S. at 146 (court not required to admit expert opinion solely on expert's assurance of reliability).

**¶23** Given the record, the court was well within its discretion to conclude that a fundamental step in White's analysis was unreliable, thereby rendering his opinion on Wakefield's damages inadmissible. *In re Paoli*, 35 F.3d at 745. Simply put, White's conflicting statements and testimony regarding his calculation of Aspen's market value, coupled with his admission that he had not followed a generally accepted approach to valuation and inability to offer more than his assurance of his methodology's reliability, created substantial doubt that White employed "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *see also Miller*, 234 Ariz. at 298, ¶ 23 (expert must explain how his or her "methods, reasoning, and opinions" are based on an accepted body of learning or experience). Thus, the court did not abuse its discretion under Rule 702 and *Daubert* by precluding White's opinion concerning Wakefield's damages.

**B. The Superior Court did not Err by Granting Aspen's Motion *in Limine* to Preclude Aspen's Financial Documents.**

**¶24** The Company moved *in limine* to preclude Wakefield "from introducing any financial documents or discussing the contents of financial documents" dated after January 14, 2014. This is the date the Company

asserted was the alleged breach of the agreement. As a result, the court held a hearing on the motion in September 2019. During the hearing, the discussion turned to how Wakefield intended to present Aspen's financial documents given the court's decision precluding his economic-damages expert. Wakefield argued that he was entitled to introduce and discuss Aspen's relevant financial records, including documents from August 2014 and December 2015, to demonstrate the value of Aspen's stock during that period. When prompted by the court to identify a witness capable of engaging in this analysis, Wakefield asserted that he could "testify about those financial documents and the changes, for example, in the cost of goods sold and that sort of thing" because he "ran the company and knew the financials."

¶25 The court granted the motion *in limine*. In a detailed ruling, the court concluded that Wakefield was entitled to give his opinion concerning the value of Aspen and its stock under the well-settled principle that a prospective owner of property can testify to its value. Citing this court's decision in *City of Tucson v. Tanno*, 245 Ariz. 488, 493 (App. 2018), however, the court noted that the owner-opinion rule does not permit testimony that is "purely speculative or not based upon reality." It then concluded that Wakefield could not introduce Aspen's financial documents to support his damages claim because "determining the value of a company using its financial reporting is something that requires expert testimony."

¶26 On appeal, Wakefield contends the court erred by granting the motion *in limine*, arguing that he should have been permitted to discuss Aspen's financial documents, as "[he] is an expert when it comes to understanding his own business, including his own financials." Wakefield again identifies the relevant period concerning Aspen's financial documents as including August 2014 through December 2015.

¶27 Arizona Rule of Evidence 701 governs the admissibility of lay opinion testimony. Because the 2012 amendment to Rule 701 specifically adopted Federal Rule of Evidence 701, we look to the federal rule and its interpretation for guidance. *See Salazar-Mercado*, 234 Ariz. at 592–93, ¶ 7. The decision to admit or exclude lay opinion testimony lies "within the sound discretion of the trial court" and will be upheld absent a showing that the ruling is "clearly erroneous or an abuse of discretion." *Groener v. Briehl*, 135 Ariz. 395, 398 (App. 1983).

¶28 Because Wakefield was not disclosed or qualified as an expert witness, his proposed testimony concerning the value of Aspen from August 2014 to December 2015 could only be admissible as relevant lay

opinion testimony under Rule 701. In this context, the only basis for Wakefield to offer opinion testimony of Aspen's value was as a present or prospective owner of Aspen. "In Arizona, a property owner may always testify about the value of his or her property because '[a]n owner of property has, by definition, knowledge of the components of value that are useful in ascertaining value.'" *Tanno*, 245 Ariz. at 493, ¶ 18 (quoting *Town of Paradise Valley v. Laughlin*, 174 Ariz. 484, 486 (App. 1992)). For business owners, testimony concerning value is admissible "not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701 advisory committee's notes to 2000 amendments.

¶29        However, although the owner-opinion rule is broad, the scope of permissible testimony under Rule 701 is still confined to matters that fall within the business owner's "particularized knowledge." *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685 (5th Cir. 2003); *see also* Ariz. R. Evid. 602; *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 455–56 (App. 1983) (recognizing personal knowledge requirement under Rules 602 and 701). "This foundational requirement helps to eliminate the risk that a party will circumvent the reliability requirements set forth in [Federal Rule 702] by adducing expert testimony in lay witnesses' clothing." *DIJO, Inc.*, 351 F.3d at 685–86; *see also United Cal. Bank*, 140 Ariz. at 456 ("[W]here the owner has no knowledge of the value about which he expresses an opinion, the presumption arising from ownership is overcome and the opinion may be inadmissible.") (quoting M. Udall, *Arizona Law of Evidence* § 120 at 258 (1960)).

¶30        Here, even under the broad owner-opinion rule, Wakefield could not show that he had the requisite first-hand knowledge of Aspen's financial affairs from August 2014 to December 2015 to opine on the value of Aspen or interpret or comment on its financial documents from that period. *See Tanno*, 245 Ariz. at 493, ¶ 20 (excluding owner's opinion concerning the value of the property based upon "hypothetical investment" theory was appropriate where "theory was not rooted in her experience as a land owner"); *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 675–76 (7th Cir. 2009) (owner of the property could testify to the value of the property, but could not "merely repeat another person's valuation" or discuss hearsay outside his knowledge); *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 930, (10th Cir. 2004) (president of the company could not testify to lost profits using a damages model outside his knowledge). It is uncontested that Wakefield was not participating in the Company by the end of August or September 2014, and he was terminated from employment

by October 2014. To support his claims on appeal, Wakefield relies only on the business expertise he developed by founding Applied and growing its business and not on any personal knowledge of Aspen's relevant financial records. However, "substantial business experience" alone is insufficient to pass muster under Rule 701. *See DIJO, Inc.*, 351 F.3d at 686.

**¶31** Importantly, we note the superior court's ruling here did not exclude Wakefield from testifying about the value of Aspen and, consequently, the value of its stock. On the contrary, the court specifically allowed Wakefield to express an opinion about the value of Aspen, and he did so at the trial. Nor did its ruling prevent Wakefield from asserting that his expertise in the medical-supply industry and his experience founding and managing Applied formed the basis for his opinion. Instead, the court merely prohibited Wakefield from attempting to buoy his lay opinion through some quasi-forensic analysis of Aspen's financial records for the period following his departure from the Company. Indeed, the court confirmed as much during the trial by stating several times that Wakefield was not precluded from discussing relevant financial matters within the scope of his knowledge. Thus, the court did not abuse its discretion by finding that expert testimony was necessary to analyze Aspen's financial records during the period identified by Wakefield or that permitting Wakefield to do so himself would exceed the boundaries of permissible owner-opinion testimony under Rule 701.[5]

## C. The Superior Court Correctly Granted Aspen's Motion to Preclude the August 2014 Term Sheet Under Arizona Rule of Evidence 408.

**¶32** Wakefield argues the court erred by granting the Company's motion *in limine* precluding the specific dollar figures contained in an August 13, 2014, letter ("Term Sheet") sent by Aspen's then-counsel detailing a proposed buyout of Wakefield's Aspen stock. The Term Sheet was attached to an email in which Aspen's counsel described the company's position concerning Wakefield, Britt, and Carlson's business relationship and included terms valuing Aspen's stock at five dollars per

---

[5]     For the first time in his reply brief, Wakefield appears to challenge a separate ruling by the court precluding him from opining on the value of Applied, rather than the value of Aspen and its stock. Because he failed to raise this issue in his opening brief, it is waived. *ADOR v. Ormand Builders, Inc.*, 216 Ariz. 379, 385, n.7 (App. 2007) (issues raised for first time in reply brief are waived).

share. The Term Sheet also noted the offer was contingent upon Wakefield signing several other agreements, including mutual releases.

¶33        In its motion, the Company argued that the court should preclude the dollar figures under Rule 408 because the Term Sheet was a settlement offer and Wakefield sought to introduce the figures as evidence of the amount of a disputed claim. In his response, Wakefield argued that the dollar figures were relevant to prove the value of his claim for damages—namely, the value of Aspen's stock. Wakefield further argued that Rule 408 did not apply to the dollar figures because the Term Sheet was part of negotiations concerning a business transaction between the parties, not an offer to settle a disputed claim.

¶34        The court excluded the evidence. In its ruling, the court found the circumstances existing in August 2014 and language of the Term Sheet—including the provision discussing the execution of mutual releases—indicated the Term Sheet was an offer attempting to avoid litigation over the deteriorating relationship between Wakefield and Aspen, Britt, and Carlson.

¶35        "Generally, we review challenges to the court's admission or exclusion of evidence for an abuse of discretion." *McMurtry v. Weatherford Hotel, Inc.*, 231 Ariz. 244, 258, ¶ 44 (App. 2013). However, we review the interpretation of court rules *de novo*. *Phillips v. O'Neil*, 243 Ariz. 299, 301, ¶ 8 (2017). Because Rule 408 is modeled after Federal Rule 408, we look to "its interpretation by federal courts to aid our interpretation of the Arizona rule." *Id.* at 302, ¶ 14.

¶36        In pertinent part, Rule 408 provides:

> Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim[:]
>
> > (1) Furnishing, promising, or offering . . . a valuable consideration in compromising or attempting to compromise the claim[.]

Relying on the Tenth Circuit's decision in *Big O Tires Dealers, Inc. v. Goodyear Tire & Rubber Co.*, Wakefield argues that no dispute had arisen concerning his claims in August 2014 because there is no indication from the language of the Term Sheet or the surrounding circumstances that the discussions between Aspen and Wakefield had "crystallized to the point of threatened litigation." 561 F.2d 1365, 1373 (10th Cir. 1977). Thus, Wakefield concludes

that Rule 408 could not apply to the Term Sheet, and the court erred by excluding the evidence.

¶37     However, most federal courts to consider the question have held that Rule 408 applies "where an actual dispute or a difference of opinion exists, rather than when discussions crystallize to the point of threatened litigation." *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 528 (3rd Cir. 1995); *Macsherry v. Sparrows Point, LLC*, 973 F.3d 212, 222 (4th Cir. 2020); *Weems v. Tyson Foods, Inc.*, 665 F.3d 958 965 (8th Cir. 2011); *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 295, n.38 (5th Cir. 2010); *Dallis v. Aetna Life Ins.*, 768 F.2d 1303, 1307 (11th Cir. 1985). "Both the timing of the offer and the existence of a disputed claim are relevant to the determination." *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2nd Cir. 1992). But "when the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers." *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir. 1987). As aptly described by the Fourth Circuit in *Macsherry*, the broader understanding of the term "dispute"

> not only best interprets [Federal] Rule 408(a)'s plain language, but also best promotes the "public policy favoring the compromise and settlement of disputes" underlying this exclusionary rule. After all, the value of promoting efforts to settle disputes that have entered the doors of a court applies all the more to disputes that haven't yet done so.

973 F.3d at 222 (quoting Fed. R. Evid. 408 advisory committee's notes to 1972 proposed rule); see also *Phillips*, 243 Ariz. at 302–03, ¶ 15 (applying public policy underlying federal rule to Arizona rule).

¶38     Applying this meaning of "dispute," we conclude there was ample evidence for the court to find that the Term Sheet fell within the ambit of Rule 408. During the hearing, Aspen introduced excerpts from Wakefield's deposition wherein he claimed that by June 2014, he had retained outside counsel because Britt was no longer looking out for his best interests. *See Mundy v. Household Fin. Corp.*, 885 F.2d 542, 547 (9th Cir. 1989) (release agreement barred under Federal Rule 408 where plaintiff "had retained legal counsel at the time the offer was made"); *Olin Corp. v. Ins. Co. of N. Am.*, 603 F. Supp. 445, 450 (S.D.N.Y. 1985) (evidence that negotiations were settlement discussions included the fact that parties had "retained outside counsel").

¶39     Moreover, the Term Sheet itself references a dispute over the characterization of Britt, Carlson, and Wakefield's status within Aspen and

explicitly states that the offer would be subject to the execution of mutual liability releases. *See Pierce*, 955 F.2d at 827 (job offer conditioned on release of party's claims "was an attempt to compromise a claim"). And a September 2014 letter sent by Wakefield's then-counsel expressly threatening litigation should the buyout negotiation not conclude to Wakefield's satisfaction confirms the Term Sheet was not merely the terms of a business transaction but an attempt to avoid litigation surrounding the parties' failing business relationship. *See Olin Corp.*, 603 F. Supp. at 450 (finding that Federal Rule 408 applied to alleged "business communications" occurring between November 1981 and December 1982 because one letter sent during that period expressly "conceded that litigation was possible").

**¶40**         Given the evidence presented, the court did not abuse its discretion by finding the dollar figures contained in the Term Sheet inadmissible under Rule 408.[6]

**D. The Superior Court Committed No Error by Denying Wakefield's Motion for Judgment as a Matter of Law and a New Trial Concerning the Company's Intentional Interference with Contract Claim.**

**¶41**         At the close of evidence in Aspen's case, Wakefield moved for judgment as a matter of law concerning the Company's claim for intentional interference with contract, which alleged that Wakefield had tortiously induced the Company's largest supplier, Mac Medical, to breach its agreement with Applied in February 2015. Wakefield argued that Aspen had failed to introduce evidence that he had acted improperly, a necessary element of an intentional-inference claim. *See Safeway Ins. v. Guerrero*, 210 Ariz. 5, 10, ¶ 14 (2005). The court denied the motion.

**¶42**         Following the jury's verdict, Wakefield renewed his motion for judgment as a matter of law and moved alternatively for a new trial, arguing that (1) Aspen failed to prove he acted improperly; (2) the jury's verdicts finding in his favor on Aspen's breach-of-fiduciary-duty claim and

---

[6]         For the first time in his reply brief, Wakefield contends that even if the Term Sheet constituted a settlement offer within the meaning of Rule 408, it should have been admissible against Britt individually because he was not a party to the offer. Because Wakefield did not raise this argument either in his opening brief or before the superior court, it is waived. *Ormond Builders, Inc.*, 216 Ariz. at 385, n.7; *Canyon Ambulatory Surgery Ctr. v. SCF Ariz.*, 225 Ariz. 414, 418, ¶ 10, n.11 (App. 2010).

against him on its intentional-interference claim were inconsistent; and (3) Aspen's closing argument addressing the intentional-interference claim exceeded the boundaries of permissible argument. The court denied the motions.

**¶43** Wakefield repeats the arguments on appeal. We review *de novo* the denial of a motion for judgment as a matter of law. *ABCDW LLC v. Banning*, 241 Ariz. 427, 433, ¶ 16 (App. 2016). A motion for judgment as a matter of law should be granted "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 236 Ariz. 568, 578, ¶ 25 (App. 2015). We view the evidence in the light most favorable to upholding the jury's verdict and will affirm if substantial evidence exists that would allow a reasonable person to reach that result. *Id.* We do not weigh the witnesses' credibility or resolve conflicting evidence. *Dupray v. JAI Dining Servs. (Phoenix), Inc.*, 245 Ariz. 578, 582, ¶ 11 (App. 2018). Instead, we give complete deference to the jury's right to resolve the matters. *Id.*

**¶44** We review for an abuse of discretion the court's denial of a motion for a new trial on the ground that the verdict was against the weight of the evidence. *Spring v. Bradford*, 243 Ariz. 167, 170, ¶ 11 (2017). "[W]e give great deference to the jury's factual findings." *Larsen v. Decker*, 196 Ariz. 239, 244, ¶ 27 (App. 2000). We do the same in reviewing the verdict itself. *See S. Dev. Co. v. Pima Cap. Mgmt. Co.*, 201 Ariz. 10, 13, ¶ 3 (App. 2001).

**¶45** At the outset, we reject Wakefield's argument concerning the allegedly inconsistent verdicts for breach of fiduciary duty and intentional interference for two reasons. First, if Wakefield believed the jury verdicts concerning these claims were inconsistent, he was required to move for resubmission of the case to the jury under Arizona Rule of Civil Procedure 49(f)(1) after the verdicts were rendered but before the jurors were released. *Trustmark Ins. v. Bank One, Ariz., NA*, 202 Ariz. 535, 543–44, ¶¶ 38–42 (App. 2002) (failure to object to inconsistent verdict until after the jury is excused waives the argument); *Gonzalez v. Gonzalez*, 181 Ariz. 32, 35–36 (App. 1994). By not doing so, Wakefield has waived any argument related to the alleged inconsistency. *See Gonzalez*, 181 Ariz. at 36 (noting that allowing litigants to object to inconsistent verdicts in post-trial motions would endorse impermissible jury-shopping).

**¶46** Second, even assuming Wakefield did not waive the argument, the verdicts are not inconsistent. The jury instruction given for

the Company's breach-of-fiduciary-duty claim against Wakefield specifically stated that the claim concerning Wakefield's fiduciary duties applied "during the time of his employment." The instruction did not reference duties after Wakefield's employment termination. And, as described below, there was substantial evidence that Wakefield engaged in improper behavior concerning Applied's contract with Mac Medical following his employment termination in October 2014.

### 1. Reasonable Evidence Supported the Jury's finding that Wakefield Improperly Interfered with Applied's Contract.

¶47        Wakefield contends that the evidence presented at the trial was insufficient to demonstrate he acted improperly. Instead, Wakefield argues that during the relevant time, he legally competed with the Company and "[t]here is no evidence that [he] acted illegally or inequitably, or committed fraud, duress, or abuse of economic power."

¶48        "[A] cause of action in tort is available to a party to any contract, at-will or otherwise, when a third party improperly and intentionally interferes with the performance of that contract." *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 387 (1985), *superseded by statute on other grounds as stated in Powell v. Washburn*, 211 Ariz. 553, 560, ¶ 29 (2006). Ordinarily, there is no liability for interference with contracts or business relationships "absent a showing that [the] defendant's actions were improper as to motive or means." *Id.* at 388. We evaluate whether a defendant's actions were improper by examining seven factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Id.* at 387; *see also Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs. Inc.*, 216 Ariz. 185, 188 (App. 2007); Restatement (Second) of Torts § 767 (1979).

**¶49** The improper element of tortious interference "generally is determined by weighing the social importance of the interest the defendant seeks to advance against the interest invaded." *Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 34 (1986). In Arizona, we give the most weight to the first two factors of the seven-factor analysis. *Guerrero*, 210 Ariz. at 12, ¶ 22. Because our supreme court explicitly adopted the Restatement's factors for determining whether conduct is improper, we rely on its guidance in our analysis of the evidence presented in this case. *Wagenseller*, 147 Ariz. at 388.

**¶50** We turn first to the nature of Wakefield's conduct. Based on the trial record, the jury reasonably concluded that Wakefield knowingly misrepresented the Company's prospects and violated industry customs to induce Mac Medical to abandon its contract with Applied. *See* Restatement § 767 cmt. c (fraudulent misrepresentations and violations of industry customs may be evidence of improper conduct, even when the "fraudulent representation is not of such a character as to subject [the defendant] to liability for . . . other torts").

**¶51** Through two witnesses—Shannon McPhearson and a sub-distributor of Mac Medical, Amber Crowder—the Company presented evidence that Mac Medical breached its contract with Applied, in part, because Wakefield made misrepresentations to McPhearson and others during several meetings in December 2014 and January 2015. McPhearson and Crowder both acknowledged that the decision to breach was based on some combination of statements by Wakefield that Applied (1) was losing its supplier; (2) would have no inventory to provide to Mac Medical; and (3) was going out of business. Based on the evidence presented concerning the state of the Company when Wakefield departed, the jury could reasonably conclude that Wakefield knew these statements were false and misleading when made and that he intended to persuade Mac Medical to breach its contract with Applied.

**¶52** The Company also presented evidence that Mac Medical breached its contract with Applied because Wakefield offered to pay Mac Medical higher commission rates than Applied's. Information concerning the commission rates paid to distributors is considered confidential within the medical supply and sales industry. Britt and Wakefield acknowledged that Applied and Wakefield's current employer considered such information confidential. Thus, the jury could reasonably conclude that Wakefield induced Mac Medical to breach its contract with Applied by

taking advantage of the confidential information regarding the commission rates paid by Applied to Mac Medical in violation of industry customs.

¶53        Turning next to Wakefield's motive, a jury could reasonably find Wakefield was primarily motivated by a desire to interfere with the Company's contractual relations rather than a general desire to compete. *See* Restatement § 767 cmt. d (if "desire to interfere" is the primary motive for actor's conduct, "it may carry substantial weight in the balancing process"). Both Britt and Carlson testified that shortly before Wakefield's acrimonious exit from the Company, Wakefield warned them that he controlled Applied's suppliers and distributors and could cut the Company off. These conversations culminated in threats to "burn" the company to the ground. In addition, Amber Crowder testified that after Wakefield left the Company, he was "extremely upset" about the matter and indicated that he would "take Applied's business." Given the timing between Wakefield's statements, his departure from the Company, the meetings between Wakefield and McPhearson, and Mac Medical's decision to breach its contract with Applied, there was ample basis for the jury to conclude Wakefield induced Mac Medical to breach its agreement to carry out his threats against the Company. *See* Restatement § 768 cmt. d (noting interplay "between the factor of motive and that of the proximity of the actor's conduct to the actual interference").

¶54        Finally, the Company also showed that Wakefield sought to cloak his efforts to induce Mac Medical to breach its contract by concealing his involvement with ReGen, which took Mac Medical's business from Applied. Although Wakefield claimed to be a consultant for a separate entity when he met with McPhearson and others, the Company introduced evidence that Wakefield was a "blind partner" with ReGen and that ReGen and the entity Wakefield consulted for were owned by the same individuals. Therefore, a jury could reasonably find that Wakefield's interference was not the result of open, honest, and innocent competition but a directed effort to damage the Company.

¶55        Accordingly, although "hatred or a desire for revenge is not alone sufficient to make [Wakefield's] interference improper," the evidence surrounding Wakefield's motives for interfering with Applied's contract with Mac Medical adds significant weight in favor of finding that Wakefield acted improperly. Restatement § 768 cmt. g; *see also Bar J Bar Cattle Co., Inc. v. Pace*, 158 Ariz. 481, 485 (App. 1988) ("One who interferes with the contractual rights of another for a legitimate competitive reason does not become a tort-feasor simply because he may also bear ill will toward his competitor.").

19

¶56 In arguing the Company failed to show he acted improperly before this court, Wakefield relies on the conflicting evidence surrounding Mac Medical's decision to breach its contract with Applied and his freedom to compete legally with the Company following his termination. But it is the "function of the jury to weigh conflicting evidence and inferences and to determine the credibility of witnesses." *Correa v. Pecos Valley Dev. Corp.*, 126 Ariz. 601, 607 (App. 1980). We will not disturb the jury's decision to resolve the conflicting evidence against Wakefield.

¶57 Moreover, contrary to Wakefield's assertions, balancing social interests here tips heavily towards the Company because Wakefield directly interfered with the contractual relations between Applied and Mac Medical. *See* Restatement § 768 cmt. h (inducement to commit a breach of legal duty cannot be justified by "the mere fact of competition"); *see also id.* § 767 cmt. f ("If the interest of the other has been already consolidated into the binding legal obligation of a contract, . . . that interest will normally outweigh the actor's own interest in taking that established right from him."). Under these facts, the "social interest in the security of transactions and the greater definiteness of [Applied's] expectancy outweigh the interests in [Wakefield's] freedom of action," and his general right to compete with the Company, therefore, carries little weight. *Id.*

¶58 The court did not err by denying Wakefield's motion for judgment as a matter of law and a new trial.

## 2. Aspen did not Exceed the Bounds of Permissible Argument.

¶59 During closing arguments, Aspen's counsel argued that Wakefield secretly became an owner of a competing business while still a shareholder at Aspen. On five occasions while describing Wakefield's conduct, Aspen's counsel stated something akin to "this is what fraud looks like." Wakefield moved for a mistrial after Aspen ended its argument, asserting the use of the term "fraud" was improper because that allegation was outside the evidence and "[Aspen doesn't] have a fraud claim." The court denied the motion. Wakefield renewed the argument in his motion for a new trial, which the court again denied. On appeal, Wakefield asserts the court abused its discretion by denying his motion for a new trial on this ground, arguing that Aspen's counsel's references to fraud were outside the evidence and improper.

¶60 The superior court has broad discretion in determining whether the alleged improper conduct of an attorney justifies granting a new trial. *Waid v. Bergschneider*, 94 Ariz. 21, 24 (1963). When considering a

motion for a new trial on the grounds of misconduct, the trial court exercises its discretion to decide whether the misconduct occurred and materially affected the aggrieved party's rights. *Leavy v. Parsell*, 188 Ariz. 69, 72 (1997). Concerning closing arguments, "[t]he rule is that wide latitude is allowed in the discussion of facts supplied by the evidence and the inferences to be drawn therefrom." *Beliak v. Plants*, 93 Ariz. 266, 269 (1963). "The granting of a new trial because of the misconduct of counsel in closing argument is only sparingly granted. It should never be granted for a disciplinary measure, but only to prevent a miscarriage of justice." *Anderson Aviation Sales Co. v. Perez*, 19 Ariz. App. 422, 429 (1973).

**¶61** Given the wide latitude afforded counsel in closing arguments, and our deference to the superior court's ruling, we cannot say that Aspen's comparisons of Wakefield's conduct to fraud were outside the evidence or an unreasonably drawn inference. The impropriety element of an intentional-interference claim may be satisfied by proof that the defendant committed fraud. This is true "even when [the defendant's] fraudulent representation is not of such a character as to subject him to liability for . . . other torts." Restatement § 767 cmt. c. Leaving aside the strength of the evidence referenced by Aspen, it was entitled to attempt to persuade the jury that Wakefield committed fraud to support its interference claim.

**¶62** Moreover, even if we agreed that Aspen's statements came close to an appeal to passion or prejudice rather than a reasonable inference drawn from the evidence, we do not believe it is appropriate to reverse a lengthy trial for isolated statements within an equally protracted closing argument, especially "where the trial judge did not feel a mistrial was warranted." *Rancho Pescado, Inc. v. Nw. Mut. Life Ins.*, 140 Ariz. 174, 188 (App. 1984). Again, the decision to grant a mistrial due to misconduct by counsel lies within the trial court's discretion, and "[t]hat court has the whole picture and is better equipped to make such a judgment than an appell[ate] court." *McFarlin v. Hall*, 127 Ariz. 220, 226 (1980). Thus, the superior court did not abuse its discretion by denying Wakefield's motion for a new trial on this argument.

## E. Wakefield Waived the Arguments Concerning the Measure-of-Damages Instruction.

**¶63** During the trial, a dispute arose over the proper measure of damages the jury was to apply to Wakefield's tort claims. Specifically, although Wakefield agreed that the appropriate measure of damages was

the value of 1 million shares of Aspen stock, he asserted that the value of the stock should be measured at the time of the trial.

¶64        However, the court found that because Wakefield's tort actions were fundamentally founded on deceit, Wakefield's damages are measured at the time of the alleged misrepresentations and omissions that gave rise to Wakefield's claims—January 2014. The court cited specific caselaw to explain its rationale. Thereafter, Appellees proposed the following instruction concerning the measure of damages:

> If you find for [Wakefield] on his claims of Breach of Fiduciary Duty, Constructive Fraud, Fraud and/or Fraudulent Concealment, you must determine his damages by determining the value of one million shares of [Aspen] as of January 2014.

The court so instructed the jury over Wakefield's objection. The jury found Britt liable for breach of fiduciary duty and constructive fraud and awarded Wakefield $562,000 in damages as the value of the Aspen stock.

¶65        On appeal, Wakefield argues the court erred by giving the instruction, asserting once again that the value of Aspen's stock should have been measured at the time of trial, not at the time of the alleged tortious conduct. Because determining the correct measure of damages involves a mixed question of fact and law, we review jury instructions involving the measure of damages *de novo. SDR Assocs. v. ARG Enters., Inc.*, 170 Ariz. 1, 2 (App. 1991). The superior court must give a jury instruction if (1) "the evidence presented supports the instruction," (2) the instruction correctly states the law, and (3) the instruction pertains to an important issue that is not dealt with by other instructions. *Czarnecki v. Volkswagen of Am.*, 172 Ariz. 408, 411 (App. 1991). "We review a court's decision to give a jury instruction for abuse of discretion," but review *de novo* "whether the given instruction correctly states the law." *State v. Solis*, 236 Ariz. 285, 286, ¶ 6 (App. 2014). We also consider the "jury instructions as a whole to determine whether the jury was properly guided in its deliberations." *Powers v. Taser Int'l, Inc.*, 217 Ariz. 398, 400, ¶ 12 (App. 2007). To determine whether prejudicial error occurred, "we may consider the jury instructions as given, the evidence at trial, the parties' theories, and the parties' arguments to the jury." *State v. Felix*, 237 Ariz. 280, 285, ¶ 16 (App. 2015).

¶66        "An instruction will only warrant reversal if it was both harmful to the complaining party and directly contrary to the rule of law." *Powers*, 217 Ariz. at 400, ¶ 12. "We will not overturn a jury verdict on the

basis of an improper instruction 'unless there is substantial doubt whether the jury was properly guided in its deliberations.'" *Id.* (quoting *Barnes v. Outlaw*, 188 Ariz. 401, 405 (App. 1996), *aff'd in part and rev'd in part on other grounds*, 192 Ariz. 283 (1998)). "Prejudice 'will not be presumed but must affirmatively appear from the record.'" *Skydive Ariz., Inc. v. Hogue*, 238 Ariz. 357, 367, ¶ 37 (App. 2015) (quoting *Walters v. First Fed. Sav. & Loan Ass'n of Phoenix*, 131 Ariz. 321, 326 (1982)).

¶67        As an initial matter, we find that Wakefield waived his challenge to the measure-of-damages instruction by failing to develop it meaningfully on appeal. In the sections of his opening and reply briefs concerning the issue, Wakefield cites only cases supporting the general notion that tort damages include all damages legally caused by the tort. *See Thomas v. Better-Bilt Aluminum Products Co.*, 171 Ariz. 550, 554 (1992). Although axiomatic to all torts, this principle says nothing about the proper measure of damages applicable to the tort claims raised and evidence presented in Wakefield's case. Even a cursory search of relevant authority reveals that questions surrounding an appropriate jury instruction on the measure of damages are intimately tied to the nature of the tort alleged, the plaintiff's theory of liability and damages, and the evidence presented at trial. *See, e.g.*, *Cole v. Gerhart*, 5 Ariz. App. 24, 26–27 (App. 1967) (reversing measure-of-damages instruction for fraud because consequential damages were available as a matter of law and evidence was sufficiently presented for the plaintiffs to recover those damages); 89 C.J.S. *Trial* § 687, Westlaw (database updated June 2021) (jury instructions on the measure of damages must not be framed "to allow the jury to assess damages without regard to the evidence in the case, or to assess damages on evidence that was not admitted for the purpose of showing the damages sustained"); 22 Am. Jur. 2d *Damages* § 800, Westlaw (database updated May 2021) (instructions must not "invade the province of the jury and should be confined to matters of damages in issue by virtue of the pleadings and evidence").

¶68        Moreover, the portions of Wakefield's briefs addressing the measure-of-damages instruction provide only the citations to the record necessary to support that he preserved the issue for appellate review. To prevail on this issue, Wakefield must explain how the instruction was contrary to the evidence presented or his theories of liability and damages. His failure to do so is telling. And Wakefield's failure to discuss any specific legal authority addressing the issue is particularly egregious here because both the superior court and the Appellees' answering briefs addressed the rationale and caselaw underlying the measure-of-damages instruction.

¶69        We have previously outlined the potential consequence of an appellant's failure to address the dispositive reasons for a court's ruling—when clearly outlined by the superior court and the appellate answering brief—in the context of an appellant's failure to file a reply brief:

> [W]here, as here, appellant's opening brief failed to address itself to substantial and determinative issues clearly developed and defined in the trial court, and these issues are again brought forth in the appellees' answering brief filed in this Court, a failure by the appellant to file a reply brief leaves this Court without any assistance in analyzing and deciding the difficult issues upon which the trial court's decision could have been based and upon which appellant's hopes for reversal must depend. . . . [I]n our opinion, the foregoing would constitute a sufficient basis for summary affirmance of the trial court's judgment[.]

*Turf Irrigation and Waterworks Supply v. Mountain States Tel. & Tel. Co.*, 24 Ariz. App. 537, 541 (App. 1975). We believe our rationale in *Turf Irrigation* applies equally to a situation where an appellant, despite receiving notice from both the superior court and appellees of the determinative basis underlying the challenged decision, nevertheless fails to raise any substantive argument addressing it. Finding waiver here also comports with the long-standing principle that an appellant must do more than merely claim that the superior court's decision is contrary to the law to justify appellate relief. *See Grubb v. Do it Best Corp.*, 230 Ariz. 1, 5, ¶¶ 15–16 (App. 2012); *Polanco v. Indus. Comm'n*, 214 Ariz. 489, 491, ¶ 6, n.2 (App. 2007); ARCAP 13(a)(7).

¶70        Substantively, we find Wakefield's limited argument concerning the measure-of-damages instruction unpersuasive. As we understand Wakefield's case, Wakefield sought to recover the value of one million shares of Aspen stock for each of his tort claims—breach of fiduciary duty, constructive fraud, common-law promissory fraud, and fraudulent concealment—under a "benefit of the bargain" theory of damages. In Arizona, actions founded in deceit permit the plaintiff to recover the "benefit of the bargain," or the difference between the property's actual value and its value if the representations were true. *Lufty v. R.D. Roper & Sons Motor Co.*, 57 Ariz. 495, 502–03 (1941); *Curry v. Windsor*, 22 Ariz. 108, 111 (1921); *Bechtel v. Liberty Nat. Bank*, 534 F.2d 1335, 1341 (9th Cir. 1976); *see also Grand v. Nacchio*, 214 Ariz. 9, 28–29, ¶¶ 66–73 (App. 2006) (analyzing breach of a fiduciary duty claim based on misrepresentations under the law governing actions for deceit). These damages are measured

at the time of the transaction. *Lufty*, 57 Ariz. at 498–503 (when the car model year was misrepresented, the measure of damages was the value of the difference between model years on the date of the sale); *Packard Pheonix Motor Co. v. McRuer*, 41 Ariz. 450, 456 (1933); *Ulan v. Richtars*, 8 Ariz. App. 351, 358, n.5 (1968); 37 Am. Jur. 2d *Fraud and Deceit* § 376, Westlaw, (database updated May 2021) ("The damages under the benefit of the bargain rule in a fraudulent misrepresentation case are measured at the time of the transaction.").

¶71        Arizona law also provides that a plaintiff pursuing a benefit-of-the-bargain theory of damages is entitled to "consequential damage beyond loss of bargain," such as out-of-pocket expenses or lost profits incurred because of the defendant's conduct. *Ashley v. Kramer*, 8 Ariz. App. 27, 31 (1968) (consequential damages are "a proper measure of damages in a fraud action"); *Bechtel*, 534 F.2d at 1341 (in addition to the benefit of the bargain, "the buyer may recover any consequential damages that may have proximately resulted from the fraudulent conduct of the seller"); *see also Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 36 (App. 1996) ("Consequential damages are losses 'not inherent in the nature of the transaction.'") (quoting Restatement § 549 cmt. a). But such damages must be shown to be legally and factually caused by the defendant's tortious conduct and must be "reasonably certain and not based on speculation." 22 Am. Jur. 2d *Damages* § 340, Westlaw (database updated May 2021); *see also* 22 Am. Jur. 2d *Damages* § 334 ("[D]amages usually may not include compensation for injuries that are remote from the wrongful act or are of an uncertain or speculative nature."); 2 Am. *Law of Torts* § 8:35, Westlaw (database updated March 2021).

¶72        Here, to recover consequential damages beyond the benefit of his bargain—the value of a million shares of Aspen stock as of January 2014—Wakefield would need to prove that any alleged loss of the increased value of Aspen's stock in the years following the events giving rise to his tort claims (1) was proximately caused by the alleged tortious conduct and (2) could be established with "reasonable certainty and [was] not too speculative or remote to afford reliable basis for computation." 26 Am. Jur. *Proof of Facts* 3d 119, § 9, Westlaw (database updated June 2021). Wakefield points to no evidence concerning any recoverable category of consequential damages other than his expert's opinion, which was not introduced at trial. Our review of the voluminous record has not revealed that Wakefield identified or distinguished between any claims for direct and consequential losses. Indeed, before the trial, Wakefield disclaimed that he was seeking

consequential damages.[7] Based on this record, we can only conclude Wakefield erroneously believed that prevailing on any of his tort claims would entitle him to damages equal to the value of Aspen's stock at the time of the trial as a matter of course.

¶73        Given the authorities cited above and Wakefield's failure to identify any evidence or authority (1) supporting his entitlement to additional compensable damages in this case or (2) requiring a different measure of damages, we cannot say that he has raised "substantial doubt regarding whether the jury was properly guided in its deliberations." *State Farm Fire & Cas. In. Co. v. Grabowski*, 214 Ariz. 188, 192, ¶ 13 (App. 2007) (as amended). Thus, we conclude the court did not err by instructing the jury that Wakefield's recovery was limited to the benefit of his bargain—the value of 1 million shares of Aspen stock as of January 2014.

**F.  The Superior Court's Ruling on Attorney's Fees Was Not Erroneous.**

¶74        Wakefield raises three arguments concerning the court's award of attorney's fees and costs to Appellees under A.R.S. § 12-341.01. Wakefield contends the court erred by (1) finding the Company's declaratory-judgment claim moot and refusing to consider it in its attorney's fees ruling; (2) concluding that Wakefield's common-law promissory fraud claim and fraudulent concealment claims arose out of contract; and (3) determining that the Appellees were the successful parties in the litigation. We address each argument in turn.

      **1.    The Court Did Not Commit Reversible Error by Refusing to Consider the Company's Declaratory Judgment Action in Awarding Attorney's Fees.**

¶75        Wakefield first argues that the court erred in its determination of attorney's fees and costs by finding the Company's declaratory-judgment action against Wakefield was rendered moot by Wakefield's decision to pursue tort remedies for the value of his stock. In the declaratory-judgment action, the Company sought a declaration that

---

7        With respect to his tort claims, Wakefield stated that "it's not like a negligence claim where you've got an injury, and [you can] add to it stuff beyond the economic loss. We're not asking for anything but the economic loss, but they're a different cause of action to get to the same point, and those tort claims all basically are valued the same."

due to Wakefield's alleged breaches of the Exchange Agreement, he was not entitled to the issuance of Aspen stock.

¶76            After briefing on the issue by the parties, the court found that no justiciable controversy existed for the issuance of Aspen stock because "by the time the case went to the jury, no party claimed that [Wakefield] was entitled to stock in Aspen Biotech." Thus, the court concluded that the Company's declaratory-judgment action had been rendered moot by Wakefield's decision to pursue "the value of the stock . . . as opposed to the issuance of the actual stock."

¶77            Under the declaratory judgments act, a justiciable controversy exists if there is "'an assertion of a right, status, or legal relation in which the plaintiff has a definite interest and a denial of it by the opposing party.'" *Keggi v. Northbrook Prop. & Cas. Ins.*, 199 Ariz. 43, 45, ¶ 10 (App. 2000) (quoting *Samaritan Health Servs. v. City of Glendale*, 148 Ariz. 394, 395 (App. 1986)). "The declaratory judgments act is interpreted liberally." *Id.* However, "[c]ourts will not hear cases that seek declaratory judgments that are advisory or answer moot or abstract questions," and declaratory relief should turn on the "existing state of facts." *Thomas v. City of Phoenix*, 171 Ariz. 69, 74 (App. 1991).

¶78            We agree with the superior court that Wakefield's election of remedies rendered the Company's declaratory-judgment action moot. In his complaint, Wakefield alleged several causes of action premised on his contractual right to the stock. By the time of the trial, however, Wakefield chose to pursue only tort remedies under the theory that he was fraudulently misled into believing he had a legal right to Aspen's stock by the Appellees' misrepresentations and omissions. Because Wakefield's ability to recover the value of 1 million shares of Aspen stock under this theory was not dependent on any contractual entitlement to the issuance of shares but rather on the tortious deprivation of that entitlement, the court correctly concluded that no justiciable controversy for the declaratory judgment existed.

¶79            Moreover, there could be no further dispute on the matter once the jury returned a verdict awarding Wakefield compensatory damages equal to the value of the Aspen stock. At that point, Wakefield had acquired his remedy, and even he acknowledged before the court that he could not recover both the value of the Aspen stock and the stock itself. Therefore, a declaratory judgment addressing Wakefield's entitlement to the stock was unnecessary. Accordingly, the court appropriately determined that the Company's declaratory-judgment action was moot and

was well within its discretion to refuse to consider it in deciding which party was entitled to attorney's fees.

**2.     Wakefield's Common-law Promissory Fraud and Fraudulent Concealment Claims Are Inextricably Intertwined with his Breach of Contract Claims.**

¶80          Wakefield argues the court erred by concluding that his claims for common-law promissory fraud and fraudulent concealment "[arose] out of contract" under A.R.S. § 12-341.01. The parties devote substantial discussion in their briefs to whether Wakefield's common-law promissory fraud and fraudulent concealment claims arose out of a contract. But we need not address this often elusive and challenging question because we conclude Wakefield's fraud-related claims were inextricably interwoven with his explicit contract-based claims. *See Modular Mining Sys., Inc. v. Jigsaw Techs., Inc.*, 221 Ariz. 515, 522, ¶ 23 (noting difficulties in arising-out-of-contract analysis); *Ramsey Air Meds, L.L.C. v. Cutter Aviation, Inc.*, 198 Ariz. 10, 13, ¶ 19 (App. 2000) (same).

¶81          Under A.R.S. § 12-341.01, in "any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney fees." Whether a claim arises out of contract under A.R.S. § 12-341.01 presents a question of law that we review *de novo*. *Zeagler v. Buckley*, 223 Ariz. 37, 38, ¶ 5 (App. 2009). "It is well-established that a successful party on a contract claim may recover not only attorneys' fees expended on the contract claim, but also fees expended in litigating an 'interwoven' tort claim." *Ramsey*, 198 Ariz. at 13, ¶ 17. "Claims are interwoven when they are based on the same set of facts and involve common allegations, which require the same factual and legal development." *Hogue*, 238 Ariz. at 369, ¶ 52. When "claims are so interrelated that identical or substantially overlapping discovery would occur, there is no sound reason to deny recovery of such legal fees." *Zeagler*, 233 Ariz. at 39, ¶ 9.

¶82          Here, it is undisputed that Wakefield's promissory fraud and fraudulent concealment claims arose out of the same factual transaction as his breach-of-contract claims: the reorganization of the Company and the associated agreements entered by the parties. Therefore, Wakefield's fraud and contract claims relied on many of the same facts, as conceded by Wakefield before the trial.

¶83          In both the superior court proceedings and on appeal, Wakefield asserted that his tort and contract claims were alternative

theories of liability to arrive at the same award of "economic damages"—the value of 1 million shares of Aspen stock. Wakefield's tort and contract claims were so intertwined that the parties spent significant time discussing the potential election-of-remedies issues before the trial. Wakefield ultimately elected to proceed at the trial only on his tort claims. Thus, we conclude Wakefield's fraud and contract claims were so interrelated that identical or substantially overlapping discovery and development of the case necessarily occurred in litigating these claims, and there is "no sound reason" to deny Britt and Carlson fees for defending against the fraud claims. *Zeagler*, 223 Ariz. at 39, ¶ 9.

### 3. The Court did not Abuse Its Discretion by Finding the Appellees' Were the Successful Parties.

¶84 Finally, Wakefield challenges the superior court's determination that the Company, Britt, Carlson, and Viking, were each a "successful party" under A.R.S. § 12-341.01.

¶85 In addressing which of the parties was the "successful party" in the litigation, the court first held that Carlson and Viking were undisputedly the successful parties as to all claims raised against or by them because they had prevailed in prosecuting and defending all claims in which they were involved. Concerning the remaining parties, the court noted that "courts often employ a 'totality of the litigation' test" to determine the successful party in complex, multi-party, multi-claim suits. But the court then found the test unhelpful because the parties had "each successfully defended all fee eligible claims made by the other." Consequently, the court decided to resolve the issue by examining the seven-factor test articulated by our supreme court in *Associated Indemnity Corp. v. Warner*, 143 Ariz. 567 (1985) and the language of A.R.S. § 12-341.01(A)'s second sentence. Applying this criterion, the court concluded that the Company and Britt were also successful parties because Wakefield had rejected two settlement offers made by the Company in 2014—one for $5 million and another for a post-tax payment of $750,000—that would have allowed him to avoid litigation and achieve a more favorable result. Therefore, the court also granted the Company and Britt's application for attorney's fees.

¶86 Wakefield raises two initial arguments concerning the court's successful-party ruling. First, Wakefield contends that the superior court failed to apply the "net judgment rule" to determine the successful party. Under that test, Wakefield concludes that he should have been designated the successful party because he recovered a more significant money

judgment than the other parties. Second, Wakefield argues the court erred by considering "prelitigation settlement offers made in 2014" in its successful-party determination based on the second sentence of A.R.S. § 12-341.01(A), which provides that a party who makes an offer "in writing to settle any contested action arising out of a contract" will be deemed the successful party from the date of the offer if the final judgment is less favorable or equal to the proposal. Because the phrase "settle any contested action arising out of a contract" implies an offer made during a legal proceeding rather than before a lawsuit is filed, Wakefield asserts the court committed error by considering prelitigation settlement offers.

¶87            "The decision as to who is the successful party for purposes of awarding attorneys' fees is within the sole discretion of the trial court, and will not be disturbed on appeal if any reasonable basis exists for it." *Maleki v. Desert Palms Prof'l Props., L.L.C.*, 222 Ariz. 327, 334, ¶ 35 (App. 2009). "The superior court, in its discretion, role, and experience, may determine the prevailing party from all the circumstances[.]" *See Bobrow v. Bobrow*, 241 Ariz. 592, 598, ¶ 25 (App. 2017).

¶88            As an initial matter, we reject Wakefield's arguments to the extent he challenges the court's finding that Carlson and Viking were successful parties for all claims related to them. Carlson and Viking prevailed on every counterclaim raised by Wakefield against them—including Wakefield's interwoven common-law promissory fraud claim—and Viking successfully recovered the entire amount sought on its contract-based crossclaim against Wakefield. Accordingly, the court did not abuse its discretion by finding Carlson and Viking were entitled to attorney's fees as a successful party.

¶89            We now consider whether the court abused its discretion by finding the Company and Britt were also successful parties over Wakefield. This court has long held that the superior court is not bound to the net judgment rule in a multi-party, multi-claim case in the exercise of its discretion. Instead, it may use other tests to determine the parties' relative success concerning the various claims. *Schwartz v. Farmers Ins. Co. of Ariz.*, 166 Ariz. 33, 38 (App. 1990). Consequently, the court's refusal to apply the net judgment rule was not an abuse of discretion error. Nevertheless, we cannot endorse the court's use of the *Warner* factors to break the deadlock in its "totality of the litigation" analysis.

¶90            In *Warner*, the Arizona Supreme Court outlined a non-exhaustive, seven-factor test to aid courts in evaluating whether to grant a discretionary award of attorney's fees *after the successful party had*

30

*been determined.* 143 Ariz. at 570 (interpreting the phrase "may award" in "authorizing the trial judge to award a successful contract litigant reasonable attorney's fees"). These factors include:

(1) The merits of the claim or defense presented by the unsuccessful party.

(2) Whether the litigation could have been avoided or settled and the successful party's efforts were completely superfluous in achieving the result.

(3) Whether assessing Fees against the unsuccessful party would cause an extreme hardship.

(4) Whether the successful party prevailed with respect to all the relief sought.

*Id.* Because the *Warner* test was not crafted to assist the court with deciding *who* is the successful party, we must conclude the court erred by applying it.

**¶91** However, the court's decision to apply *Warner* is not fatal to its successful-party determination in this case. The only *Warner* factor the court found relevant and dispositive — that Wakefield could have avoided litigation and achieved a better result by accepting one of several settlement offers made by the Company before any party filed a lawsuit — is an entirely appropriate factor to consider under the "totality of the litigation" approach. The purposes of A.R.S. § 12-341.01 include (1) "encouraging more careful analysis prior to filing suit by imposing the risk of paying the opposing party's attorneys' fees where legitimate settlement offers are rejected" and (2) "promoting settlement and thus reducing caseloads involving contractual matters." *Am. Power Prods., Inc. v. CSK Auto, Inc.*, 242 Ariz. 364, 369, ¶ 20 (2017) (quotations omitted)). Thus, relying on the fact that one party could have obtained a more favorable result by accepting a legitimate settlement offer and avoiding litigation to determine the successful party is consistent with the statute's purposes. *Cf. Macsherry*, 973 F.3d at 222 ("[T]he value of promoting efforts to settle disputes that have entered the doors of a court applies all the more to disputes that haven't yet done so.").

**¶92** Moreover, the settlement comparison provision in A.R.S. § 12-341.01(A)'s second sentence does not foreclose a superior court from considering pre-suit settlement offers. The challenged sentence provides:

> If a written settlement offer is rejected and the judgment finally obtained is equal to or more favorable to the offeror than an offer made in writing to settle any contested action arising out of a contract, the offeror is deemed to be the successful party from the date of the offer and the court may award the successful party reasonable attorney fees.

A.R.S. § 12-341.01(A). While the portion of the sentence making the successful party designation automatic may be limited to settlement offers made during a legal proceeding, the provision is designed to reinforce, not deemphasize, the necessity of considering each side's settlement efforts when determining the successful party. And holding otherwise would undermine the purposes of A.R.S. § 12-341.01(A). Thus, the court's consideration of pre-action settlement offers was appropriate, and its consideration of the *Warner* factors was, at most, harmless error.

**¶93**        The only question remaining is whether the court abused its discretion in assessing the pre-suit settlement offers. In this regard, Wakefield contends the settlement offer for a post-tax payment of $750,000 was wholly inadequate to compensate him for his claims and that the court incorrectly found that it was an offer "without conditions." But the $750,000 post-tax settlement offer would have left Wakefield with $200,000 more than the amount Wakefield recovered after four years of litigation. And the court did not find that the post-tax settlement offer had no conditions; it found it did not have the same restrictive conditions as a previous settlement offer for $5 million. Given our deferential standard of review and the superior court's intimate understanding of the trial proceedings, we will not substitute our judgment for the superior court concerning the weight it gave to these pre-suit settlement offers, including its assessment of the conditions contained within each proposal. *See Warner*, 143 Ariz. at 571.[8]

---

[8]        At oral argument, Wakefield argued, for the first time, that there were distinctions between A.R.S. § 12-341.01 and the costs statute, A.R.S. § 12-341. Because he did not raise any argument concerning any alleged differences between the statutes in his briefs, the arguement is waived. *Schabel v. Deer Valley Unified Sch. Dist. No. 97*, 186 Ariz. 161, 167 (App. 1996) ("Issues not clearly raised and argued in a party's appellate brief are waived.").

**G. Wakefield's Recovery for the Value of His Aspen Stock Has Rendered Any Arguments Concerning the Summary Judgment Granted on Wakefield's Contract Counterclaims Moot.**

¶94        In September 2018, the Company and Britt moved for partial summary judgment on several of Wakefield's counterclaims, including his claims against Britt for breach of contract and the implied covenant of good faith and fair dealing arising out of the Reorganization Agreement (the "Contract Claims"). In its motion, the Company and Britt argued that Britt could not be held liable for any claims related to the Reorganization Agreement because it had been superseded and extinguished by Wakefield and Aspen's execution of the Exchange Agreement. In response, Wakefield argued that the Reorganization Agreement was not superseded because it contained additional terms not addressed in the Exchange Agreement.

¶95        The superior court granted summary judgment in favor of Britt, finding the Exchange Agreement superseded the Reorganization Agreement in "all ways relevant" to Wakefield's claims. In response to a later court ruling that appeared contrary to its summary-judgment ruling, the Appellees moved for the court to clarify what issues regarding the enforceability of the Reorganization Agreement remained at issue under Arizona Rule of Civil Procedure 56(g). The court agreed with the Appellees that it had issued conflicting decisions regarding the Reorganization Agreement, reaffirmed its finding that the Reorganization Agreement had been superseded and extinguished by the Exchange Agreement, and concluded that no party could be found liable for the Contract Claims. Consequently, the court extended its summary judgment to Carlson and all entities related to Britt and Carlson.

¶96        On appeal, Wakefield claims that the Exchange Agreement was not intended to supersede and extinguish the Reorganization Agreement because the latter agreement contains additional terms not contemplated by the former. However, we need not address the merits of Wakefield's argument because we conclude our disposition of the remaining issues in this appeal renders any problem concerning the summary-judgment ruling moot.

¶97        "[A] case becomes moot when an event occurs, pending an appeal, which renders the relief sought either impossible or without practical effect on the parties to the action." *Sandblom v. Corbin*, 125 Ariz. 178, 183 (App. 1980). In this case, even assuming we granted the relief Wakefield seeks and reverse the summary-judgment ruling, he could not recover damages under his claims for breach of contract or breach of the

implied covenant of good faith and fair dealing because doing so would result in an impermissible double recovery.

¶98　　　"A plaintiff may not receive a double recovery for the same injuries or losses arising from the same conduct or wrong." 22 Am. Jur. 2d *Damages* § 32, Westlaw (database updated May 2021); *Ball Corp. v. George*, 27 Ariz. App. 540, 545 (1976) ("There can be no double recovery."); *Snowden v. D.C. Transit Sys., Inc.*, 454 F.2d 1047, 1048 (D.C. Cir. 1971) ("A cardinal principle of law is that in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered."). "[A] person is not entitled to recover twice for the same elements of damage growing out of the same occurrence or event." 25 C.J.S. *Damages* § 11, Westlaw (database updated June 2021). Notably, the doctrine has been explicitly applied to bar subsequent actions on tort theories if the plaintiff has already recovered on a contract theory and vice versa. *See, e.g.*, *Simon v. Royal Bus. Funds Corp.*, 34 A.D.2d 758, 758–59 (N.Y. App. 1970) (because the plaintiff could not have double recovery, action for fraudulent inducement against one party raising same damages as the previous breach of contract action against another was barred); *Simon v. Noma Elec. Corp.*, 56 N.E.2d 537, 539–40 (N.Y. App. 1944) (plaintiff could not prove damages for interference-with-contract claim because plaintiff had already successfully obtained a judgment against another in a breach-of-contract action for the same damages ).

¶99　　　Here, if we were to reverse the court's summary-judgment ruling, the prohibition against double recovery would apply with full force to bar any further recovery by Wakefield against Britt for the Contract Claims. As his complaint, disclosures, and opening brief make clear, Wakefield's counterclaims were alternative theories for recovering the same damages resulting from the same indivisible injury—the failure to provide him with 1 million shares of Aspen stock. Moreover, Wakefield provided an almost identical computation of damages for each counterclaim and asserted to the court that the damages and evidence for his tort and contract claims were the same.

¶100　　　Thus, Wakefield's recovery for the value of a million shares of Aspen stock against Britt under the breach-of-fiduciary-duty and constructive fraud theories, which we affirm in this decision, bar any further award of damages against him arising from Wakefield's loss of Aspen stock, including damages arising from the Contract Claims. Wakefield's dissatisfaction with the amount of damages is immaterial, as is the fact that he could assert alternative legal theories under which to hold Britt liable. *See Saichek v. Lupa*, 787 N.E.2d 827, 835 (Ill. 2003) ("Having once

been awarded damages for the injuries by the court, she cannot seek compensation for those injuries again. That is so 'regardless of whether or not the plaintiff has recovered all that he or she might have recovered' in the initial proceeding.") (quoting *Dillion v. Evanston Hosp.*, 771 N.E.2d 357, 369 (Ill. 2002)); *Elyousef v. O'Reilly & Ferrario, LLC*, 245 P.3d 547, 549 (Nev. 2010).

¶101 Concluding that Wakefield cannot recover twice against Britt does not end our inquiry because the Contract Claims were also brought against Carlson. "If two or more tortfeasors produce a single injury, the plaintiff may sue each one for the full amount of the damage and hold the defendants severally liable[.]" 47 Am. Jur. 2d *Judgments* § 770, Westlaw (database updated May 2021). But we need not engage in an extended analysis of this issue to conclude that, assuming we reversed the summary judgment ruling, Wakefield would be barred from recovering against Carlson as well. A necessary corollary to the general doctrine of double recovery is the "one satisfaction" rule, which provides that where "one joint tortfeasor satisfies a judgment obtained by the plaintiff, all other tortfeasors are discharged from liability, and the plaintiff has no further cause of action." *Bridgestone/Firestone N. Am. Tire, L.L.C., v. Naranjo*, 206 Ariz. 447, 449, ¶ 8 (App. 2003); *see also* Restatement (Third) of Torts: Apportionment Liab. § 25(a) (2000).

¶102 Wakefield's recovery has been fully satisfied by operation of the setoff imposed in the final judgment between Wakefield, Britt, and the Company, and as stated above, we have found no infirmity in that judgment. *See* 47 Am. Jur. 2d *Judgments* § 806, Westlaw (database updated May 2021) ("[T]he purpose of setoff is to speedily and effectively satisfy judgments[.]"). As a result, Wakefield would be foreclosed from using the Contract Claims to try and recover against Carlson for an injury that has already been satisfied. *Elyousef*, 245 P.3d at 549 (holding that satisfaction of prior judgment through a settlement agreement precluded the plaintiff from asserting new claims against a new party for the same injury).

¶103 Similarly, review of the summary-judgment ruling is also moot because our affirmance of the jury's verdict and damages award would be fatal to the Contract Claims under the "law of the case" doctrine. As set forth by our supreme court in *Dancing Sunshines Lounge v. Indus. Comm'n*:

> The term "law of the case" refers to a legal doctrine providing that the decision of a court in a case is the law of that case on the issues decided throughout all subsequent proceedings in

> both the trial and appellate courts, provided the facts, issues and evidence are substantially the same as those upon which the first decision rested.

149 Ariz. 480, 482 (1986). Because the superior court would be bound by the issues decided in this appeal, including the validity of the jury's damages award and the judgment, Wakefield would not be entitled to a further award of damages from Britt or Carlson for loss of the Aspen stock. As a result, an essential element of the Contract Claims—damages—would be missing, and the court would be required to dismiss the claims based on Wakefield's inability to make a *prima facie* case for either claim. *See First Am. Title Ins. v. Johnson Bank*, 239 Ariz. 348, 353, ¶ 22 (2016) (elements of contract claim include "resulting damages") *United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, 139, ¶ 21 (App. 2006) (reversed jury's award for breach of the implied covenant of good faith and fair dealing based on lack of proof of damages); *see also Elyousef*, 245 P.3d at 549–50 (applying the related doctrine of issue preclusion to damage issue litigated in a prior suit for the same injury); *Bodam v. City of Chicago*, 609 N.E.2d 802, 804–05 (Ill. App. 1993) (same).

¶104 Finally, we note an important but ultimately not dispositive caveat to our holding. As we read Wakefield's complaint, his claim for breach of contract against Britt and Carlson originally included an allegation of damages for a seemingly different injury—the loss of after-tax distributions under a provision of the Reorganization Agreement. Wakefield's disclosed computation of damages confirms this, as it alleges an additional $750,000 in damages related to this injury. If Wakefield could proceed with the breach-of-contract claim solely for this injury on remand, we would be compelled to find that Wakefield's arguments concerning the summary-judgment ruling were not moot. However, we conclude Wakefield waived and abandoned this claim by knowingly failing to take any action once he became aware of the possibility that the court did not intend its summary judgment ruling on the Contract Claims to decide the issue.

¶105 During a hearing before the trial, Wakefield requested guidance from the court regarding his ability to mention specific provisions of the Reorganization Agreement, including the distribution provision. The court told Wakefield that it had intended its summary-judgment ruling to cover overlapping provisions of the Reorganization Agreement and Exchange Agreement, not potentially independent provisions. As the discussion continued, the court agreed that any remaining ambiguities surrounding the ruling would be problematic and expressly invited

Wakefield to make an argument concerning the issue. Wakefield made no further argument. Following the hearing, Wakefield did not file a motion addressing the issue and ultimately elected to pursue only his tort theories at trial.

¶106 "Waiver is either the express, voluntary, intentional relinquishment of a known right or such conduct as warrants an inference of such an intentional relinquishment." *Am. Cont. Life Ins. v. Ranier Constr. Co.*, 125 Ariz. 53, 55 (1980). A party may waive any contract provision made for that party's benefit, *Concannon v. Yewell*, 16 Ariz. App. 320, 321 (1972), and "litigation-related activity" may be considered to establish waiver, *Russo v. Berger*, 239 Ariz. 100, 103–05, ¶¶ 12–21 (App. 2016). Because we view Wakefield's inaction here as conclusive evidence of a knowing waiver of any further pursuit of his claim for after-tax distributions, we do not consider it in our mootness analysis. Our refusal to consider this alleged element of damages also aligns with long-standing principles of appellate waiver. *Cf. S. Ariz. Freight Lines v. Jackson*, 48 Ariz. 509, 518 (1936) ("Parties may not sit by and allow error which is not fundamental to be committed, without protesting and asking the trial court to correct the error at the time, and then later, when the judgment goes against them, ask for a new trial on that ground.").

¶107 Ultimately, because our exhaustive review of the issues raised on appeal has revealed no error requiring reversal of the jury's verdict and damages awarded in this case, Wakefield's recovery stands and permitting him to litigate the Contract Claims against Britt and Carlson could only result in an impermissible double recovery. Therefore, any arguments concerning the summary-judgment ruling on the Contract Claims are moot, and we do not address the issues further.

## ATTORNEY'S FEES AND COSTS

¶108 All parties request an attorney's fees and costs award under A.R.S. §§ 12-341 and -341.01. Per our discretion, we deny the requests for attorney's fees. However, as the successful parties on appeal, Appellees are entitled to their costs upon compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

¶**109** We affirm the superior court's judgments.



AMY M. WOOD • Clerk of the Court
FILED: AA